**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ROBERT "IZZY" KOLODNER,

Plaintiff,

v. CASE NO.:

LARRY JOE BRYANT, individually,

Defendant.

_________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Robert "Izzy" Kolodner ("Kolodner"), by and through undersigned counsel, sues Defendant, Larry Joe Bryant ("Bryant"), individually, and alleges as follows:

## PARTIES

1. Plaintiff Kolodner is a natural person domiciled in Pasco County, Florida, and is a citizen of the State of Florida.

2. Defendant Bryant is a natural person domiciled in the State of Arkansas, and is a citizen of the State of Arkansas.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over Bryant under Fed. R. Civ. P. 4(k)(1)(A) and section 48.193(1)(a)2., Florida Statutes, because Bryant committed a tortious act within Florida. Bryant directed the misrepresentations alleged below, including by text message, to Kolodner in Florida for the purpose of inducing him to execute the January Agreements. Kolodner received and relied upon those misrepresentations in Florida, and his claims arise directly from them. Because Bryant purposefully directed that tortious conduct at a Florida resident, he should reasonably have anticipated being haled into court here, and the exercise of jurisdiction over him comports with traditional notions of fair play and substantial justice.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District, including Kolodner's receipt of and reliance upon Bryant's misrepresentations and his execution of the January Agreements. This action is properly brought in the Tampa Division under Local Rule 1.04(b) because Kolodner resides in Pasco County and the action accrued there.

## FACTUAL ALLEGATIONS

**A. Kolodner's Existing Permission to Compete.**

6. Kolodner previously operated a commercial debt-settlement business through Cain & Daniels, Inc. ("Cain & Daniels").

7. In January 2023, Cain & Daniels sold the assets of its commercial debt-settlement business to Bayshore Haven, LLC ("Bayshore Haven") pursuant to an Asset Purchase Agreement (the "APA"). A true and correct copy of the APA is attached as Exhibit A.

8. The purchase price was $1,460,000, consisting of $500,000 payable at closing and the remaining $960,000 payable under a secured promissory note (the "Note").

9. The Note was subsequently assigned to Kolodner individually, and Kolodner has been the holder of the Note at all times relevant to this action.

10. In connection with the sale, Kolodner agreed to restrictive covenants limiting his ability to compete with the business sold to Bayshore Haven through January 12, 2030 (the "Restrictive Covenants").

11. At all times relevant to this action through at least January 2026, Bryant held an ownership interest in Bayshore Haven and acted on its behalf in its dealings with Kolodner.

12. On or about February 3, 2025, Kolodner, Bayshore Haven, Cain & Daniels, and Corporate Solutions Group, Inc. ("CSG") entered into an agreement (the "Competition Agreement") permitting Kolodner to conduct specified commercial debt-settlement activities through CSG or its successor in exchange for paying Bayshore Haven twenty percent of the gross revenue generated by those activities (the "Revenue Share"). A true and correct copy of the Competition Agreement is attached as Exhibit B.

13. The Competition Agreement thus gave Kolodner a contractual right to continue working in the commercial debt-settlement industry notwithstanding the Restrictive Covenants.

14. Bryant personally negotiated the Competition Agreement with Kolodner on behalf of Bayshore Haven.

**B. Bryant Induced Kolodner to Surrender His Existing Permission to Compete.**

15. A dispute later arose concerning Kolodner's activities under the parties' existing agreements, centered on Kolodner's potential work with Gabriel and Marks ("Gabriel and Marks"), a commercial debt-settlement business.

16. During that dispute, Bryant confirmed in writing that the Competition Agreement was not at issue: "To be clear, we have no issue with the shared revenue from CSG, and we're happy for you to continue working with CSG as agreed. That

arrangement is not in dispute." Bryant distinguished that arrangement from his concerns about Kolodner's involvement with Gabriel and Marks.

17. To resolve the dispute, Kolodner and Bayshore Haven, acting through Bryant, negotiated a Settlement Agreement and a Third Addendum to Secured Promissory Note (the "Third Addendum") in January 2026 (collectively, the "January Agreements").

18. The Settlement Agreement, as presented to Kolodner for signature, terminated the Competition Agreement and reinstated the Restrictive Covenants, subject only to a limited exception for work involving Gary Black. It did so even though Bryant had already confirmed that the Competition Agreement was "not in dispute."

19. Before signing, Kolodner questioned Bryant about those provisions and explained that he wanted to retain the ability to conduct limited commercial debt-settlement activities in exchange for the Revenue Share.

20. On or about January 23, 2026, in response to Kolodner's questions, Bryant sent Kolodner a text message, which Kolodner received in Florida, representing that termination of the Competition Agreement would be followed by a replacement competition agreement covering Kolodner's work with Gabriel and Marks. Bryant wrote: "Our thought process was let's close the loop and do a new

competition agreement based around Gabriel and Marks after you talked to your step son."

21. In the same exchange, Bryant represented that the replacement agreement could extend beyond Gabriel and Marks to Kolodner's other commercial debt-settlement activities, writing: "We could make that broader than just Gabriel and Marks too."

22. Bryant thus presented termination of the Competition Agreement not as the end of Kolodner's right to compete, but as an interim step toward a replacement agreement that would allow Kolodner to continue working in commercial debt settlement.

23. Bryant did not disclose to Kolodner, before Kolodner signed the January Agreements, that Bryant intended to sell any portion of his ownership interest in Bayshore Haven, or that decisions concerning any replacement agreement would soon rest with someone else.

24. In reliance on Bryant's representations, Kolodner signed the January Agreements on January 26, 2026, as reflected in the electronic-signature audit trail, thereby surrendering his existing right to compete under the Competition Agreement.

25. As part of the January Agreements, Kolodner also made financial concessions as holder of the Note, agreeing to a $10,000 reduction of the outstanding

balance, deferral of the February 2026 installment, and a waiver of interest for the period from January 16 through February 15, 2026. The Third Addendum provided for monthly installments commencing March 15, 2026, and extended the Note's maturity date to March 15, 2033.

26. Had Kolodner known that no replacement competition agreement would follow, he would not have signed the January Agreements on those terms.

### C. After Kolodner Signed, Bryant Delayed and Then Abandoned the Replacement Agreement.

27. After signing the January Agreements, Kolodner followed up with Bryant to obtain the replacement competition agreement Bryant had described before execution.

28. On or about January 31, 2026, rather than provide a replacement agreement, Bryant requested information concerning Kolodner's anticipated role at Gabriel and Marks, verification of his role and income, and procedures for resolving disagreements concerning permitted activities.

29. Kolodner provided the requested information and explained that Gabriel and Marks was awaiting his assistance on pending deals, but that he would not become involved until the replacement agreement was in place. Consistent with the parties' pre-execution discussions, Kolodner also reiterated his intention to conduct limited commercial debt-settlement activities in exchange for the Revenue

Share. Bryant did not dispute that a replacement agreement would follow; he responded that he would review the information and follow up.

30. On or about February 11, 2026, Kolodner asked Bryant for "any update on the agreement." Bryant responded, "sorry she and I had a call like two days ago," and "Maybe a drat [sic] next week." Bryant added that the "biggest thing we are trying to solve is how to address any future disagreements."

31. On or about February 13, 2026, having still received no replacement agreement, Kolodner advised Bryant that Gabriel and Marks was considering hiring another experienced individual and needed to know whether he could proceed. Bryant responded that his attorney had not identified a workable arrangement other than one that Bryant could revoke immediately. Before Kolodner signed the January Agreements, Bryant never suggested that any replacement agreement would be revocable at will.

32. Kolodner responded that he had intended to help Gabriel and Marks for only a few months and that he understood Gabriel and Marks's concern about losing a permanent hire. Consistent with the parties' pre-execution discussions, Kolodner also confirmed his intention to continue limited commercial debt-settlement work in exchange for the Revenue Share, asking: "Are we still good [i]f in a few months I decide to hire somebody part-time like before and just keep my debt settlement portion to myself and pay the 20% like we did last year?"

33. On or about February 18, 2026, Kolodner reminded Bryant that he had surrendered his existing right to compete on the understanding that the parties would enter into a replacement agreement. Bryant did not deny that understanding. Instead, he deferred further discussion so that a new partner could weigh in.

34. On or about February 23, 2026, Bryant advised Kolodner that he had contacted Bayshore Haven's new operating partner, Barrett Rodriguez ("Rodriguez"), to arrange a meeting among the three of them.

35. On or about March 11, 2026, Bryant informed Kolodner that Rodriguez had purchased a forty-nine percent (49%) interest in Bayshore Haven and was responsible for its day-to-day decisions. Bryant further stated that he did not believe Rodriguez was considering a new competition agreement and told Kolodner to take the matter up with Rodriguez directly.

36. Kolodner objected, explaining that Bryant's representations concerning a replacement agreement were the reason he signed the January Agreements and surrendered his existing right to compete. Bryant responded that Kolodner should give Rodriguez more time.

37. In a written objection, Kolodner told Bryant that the anticipated replacement arrangement was "the entire point of me signing that agreement" and that he "would've never signed off if there was no intention to rework another deal in debt settlement and or Gabriel Marx [sic]."

38. In another written communication, Kolodner offered to forgo the extension of the Note's maturity date under the Third Addendum and to receive increased monthly payments instead.

39. Neither Bryant nor Bayshore Haven ever presented Kolodner with a replacement competition agreement.

40. Kolodner later learned that Bryant had sold his entire ownership interest in Bayshore Haven.

**D. The Subsequent Restrictive-Covenant Dispute and Settlement.**

41. Following the ownership change, counsel for Bayshore Haven and B & J Acquisition Group, LLC demanded that Kolodner cease activities that they contended violated the Restrictive Covenants reinstated by the January Agreements and threatened to seek injunctive relief.

42. In August 2026, Kolodner resolved that dispute through a separate settlement agreement (the "August Settlement"). To obtain relief from certain of the Restrictive Covenants, Kolodner accepted $50,000 in satisfaction of the Note's then-outstanding balance of $520,088.10. A true and correct copy of the August Settlement is attached as Exhibit C.

43. The August Settlement expressly carves Bryant out of its release and preserves Kolodner's claims against him individually.

44. As a direct and proximate result of Bryant's misrepresentations, Kolodner has suffered damages, including the value of the contractual right to compete he surrendered under the Competition Agreement; the financial concessions he made under the January Agreements; the $470,088.10 difference between the Note's outstanding balance and the $50,000 he accepted to obtain relief from the Restrictive Covenants that the January Agreements reinstated; income from commercial debt-settlement work he refrained from performing while awaiting the promised replacement agreement; and other economic losses caused by Bryant's conduct.

## COUNT I – FRAUDULENT INDUCEMENT

45. Kolodner realleges paragraphs 1 through 44 as if fully set forth herein.

46. On or about January 23, 2026, in response to Kolodner's questions concerning his continued ability to compete, Bryant represented in a text message to Kolodner that, once the January Agreements were signed, Bayshore Haven would enter into a replacement competition agreement addressing Kolodner's work with Gabriel and Marks. Bryant further represented that the replacement agreement could permit broader commercial debt-settlement activities.

47. Bryant's representations were statements of his then-existing intention to provide a replacement competition agreement after Kolodner signed the January Agreements.

48. The representations were false when made. When Bryant made them, he did not intend to provide the replacement competition agreement he described, and instead was negotiating a sale of his ownership interest in Bayshore Haven. Bryant knew that the sale would place decisions concerning any replacement agreement in the hands of others.

49. Bryant made the representations with the intent to induce Kolodner to rely on them by entering into the January Agreements, surrendering his existing right to compete, and accepting the financial concessions described above.

50. The representations were material because Kolodner's ability to continue working in commercial debt settlement was central to his willingness to enter into the January Agreements, as Bryant knew from Kolodner's questions.

51. Kolodner relied on Bryant's representations to his detriment by signing the January Agreements on January 26, 2026, surrendering his existing right to compete, and accepting the financial concessions reflected in those agreements.

52. Had Kolodner known that Bryant did not intend to provide the replacement competition agreement, he would not have entered into the January Agreements on those terms.

53. Bryant is personally liable for the misrepresentations he made.

54. As a direct and proximate result of Bryant's fraudulent inducement, Kolodner has suffered the damages described above, in an amount to be established at trial.

**WHEREFORE**, Kolodner respectfully requests that this Court enter judgment in his favor and against Bryant and award:

(a) Compensatory damages in an amount to be determined at trial;

(b) Prejudgment and postjudgment interest as permitted by law;

(c) Taxable costs; and

(d) Such other and further relief as this Court deems just and proper.

**COUNT II – NEGLIGENT MISREPRESENTATION**
***(Pled in the Alternative to Count I)***

55. Kolodner realleges paragraphs 1 through 44 as if fully set forth herein.

56. On or about January 23, 2026, while negotiating the January Agreements on behalf of Bayshore Haven, Bryant supplied information to Kolodner concerning Kolodner's continued ability to engage in commercial debt-settlement activities. In a text message sent to Kolodner in Florida, Bryant stated: "Our thought process was let's close the loop and do a new competition agreement based around Gabriel and Marks after you talked to your step son." Bryant further stated: "We could make that broader than just Gabriel and Marks too."

57. In the context of Kolodner's questions about surrendering his existing permission to compete, Bryant's statements represented an existing fact: that Bryant

was then in a position to arrange a replacement competition agreement on behalf of Bayshore Haven after execution of the January Agreements.

58. To the extent Bryant believed that representation to be true when he made it, the representation was nonetheless false. Bryant's contemplated disposition of his ownership interest in Bayshore Haven, and the resulting transfer of decision-making authority to others, meant that he was not in a position to provide the replacement arrangement he represented he could arrange.

59. Bryant made the representation without knowledge of its truth or falsity, or under circumstances in which he should have known of its falsity. Bryant failed to exercise reasonable care in obtaining or communicating accurate information concerning the effect of his contemplated ownership transfer on his ability to arrange a replacement competition agreement. As the owner contemplating that transfer and communicating on Bayshore Haven's behalf, Bryant should have known that his representation was false.

60. Bryant supplied this information in connection with his business and financial interest in resolving the parties' dispute and intended to induce Kolodner to rely on it in deciding whether to execute the January Agreements, surrender his existing permission to compete, and accept the concessions on the Note.

61. Kolodner justifiably relied on Bryant's representation in executing the January Agreements and accepting those concessions. Bryant had personally

negotiated the Competition Agreement and was negotiating the January Agreements for Bayshore Haven. Kolodner specifically raised his continued ability to compete before signing, and Bryant responded directly with the statements quoted above.

62. Had Kolodner known that Bryant was not in a position to arrange the replacement competition agreement as represented, he would not have executed the January Agreements on those terms.

63. Bryant is personally liable for the misrepresentation he made.

64. As a direct and proximate result of Bryant's negligent misrepresentation, Kolodner has suffered the damages described above, in an amount to be established at trial.

**WHEREFORE**, Kolodner respectfully requests that this Court enter judgment in his favor and against Bryant and award:

(a) Compensatory damages in an amount to be determined at trial;

(b) Prejudgment and postjudgment interest as permitted by law;

(c) Taxable costs; and

(d) Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Kolodner demands trial by jury on all issues so triable.

Dated: October 30, 2026.

Respectfully submitted,

*/s/ Jordan L. Behlman*

**Jordan L. Behlman, LEAD COUNSEL**
Florida Bar No.: 111359
Email: jbehlman@lawcantrell.com
Email: lcaulder@lawcantrell.com
**Jemma A. Takx**
Florida Bar No.: 1028760
Email: jtakx@lawcantrell.com
Email: fcgservice@lawcantrell.com
**CANTRELL SCHUETTE, P.A.**
3350 Buschwood Park Dr., Ste. 195
Tampa, FL 33618
(813) 705-6275